ORAL ARGUMENT NOT YET SCHEDULED

**No. 14-5122**

═══════════════════════════════

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

─────────────────

ADIRONDACK MEDICAL CENTER, *et al.*,

*Plaintiffs-Appellants,*

v.

SYLVIA MATHEWS BURWELL,
in her official capacity as Secretary of the United States
Department of Health and Human Services,

*Defendant-Appellee.*

─────────────────

*On Appeal from the United States District Court
for the District of Columbia*

─────────────────

**APPELLANTS' BRIEF**

Ankur J. Goel
Johnny H. Walker
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, N.W.
Washington, DC 20001
Telephone:  202.756.8000
Facsimile:   202.756.8087

*Attorneys for Plaintiffs-Appellants*

# CERTIFICATE OF PARTIES,
## RULINGS UNDER REVIEW, AND RELATED CASES

The following information is provided pursuant to D.C. Circuit Rule

28(a)(1).

**A.    Parties and Amici.**

The following parties appeared before the district court.

**Plaintiffs:** The following 62 hospitals were plaintiffs before the district

court:

1.    Adirondack Medical Center

2.    Agnesian Healthcare, Inc.

3.    Albemarle Hospital Authority, d/b/a Albemarle Hospital

4.    Augusta Healthcare, Inc.

5.    Bates County Memorial Hospital

6.    Benefis Hospitals, Inc.

7.    Blessing Hospital

8.    Bothwell Regional Health Center

9.    Cape Cod Healthcare Inc.

10.    Carolinaeast Medical Center

11.    Carson Tahoe Regional Healthcare

12.    CGH Medical Center

13.    Champlain Valley Physicians Hospital

14.    Chesapeake Hospital Corporation

i

15.   Clallam County Public Hospital District 2

16.   Clearfield Hospital

17.   Community Memorial Health Center

18.   Cortland Regional Medical Center, Inc.

19.   Golden Valley Memorial Hospital District

20.   Graham Hospital Association

21.   Grenada Lake Medical Center

22.   Holy Rosary Healthcare

23.   IHC Health Services, Inc., d/b/a Dixie Regional Medical Center

24.   Joint Township District Memorial Hospital

25.   Lake Regional Health System

26.   Lawrence Memorial Hospital

27.   LRG Healthcare, d/b/a Lakes Region General Hospital

28.   Mary Lanning Memorial Hospital

29.   McAlester Regional Health Center Authority, d/b/a McAlester Regional Health Center

30.   McDonough County Hospital District, d/b/a McDonough District Hospital

31.   Memorial Hospital of Sheridan County

32.   Memorial Medical Center of West Michigan

33.   Mid-Columbia Medical Center

34.   Munson Medical Center

35.   Otero County Hospital Association, d/b/a Gerald Champion Regional Medical Center

36. Otsego Memorial Hospital

37. Passavant Memorial Area Hospital Association d/b/a Passavant Area Hospital

38. Phelps County Regional Medical Center

39. Promise Regional Medical Center-Hutchinson, Inc.

40. Rapid City Regional Hospital Inc.

41. Regional West Medical Center

42. Reid Hospital & Health Care Services Inc., d/b/a Reid Hospital

43. Rice Memorial Hospital

44. Salina Regional Health Center, Inc.

45. Sarah Bush Lincoln Health Center

46. Sky Lakes Medical Center Inc.

47. Southeastern Regional Medical Center

48. Southern Illinois Hospital Services, d/b/a Herrin Hospital

49. Southwest Medical Center

50. Southwestern Vermont Medical Center Inc.

51. SSM Regional Health Services, d/b/a St. Francis Hospital & Health Services

52. St. James Healthcare Inc.

53. St. Joseph Regional Medical Center

54. St. Joseph's Medical Center

55. St. Luke's Magic Valley Regional

56. St. Mary's Hospital & Medical Center, Inc.

57. Stillwater Medical Center Authority, d/b/a Stillwater Medical Center

58.    The Rutland Hospital, Inc.

59.    Valley View Hospital Association

60.    Wayne Memorial Hospital Inc.

61.    Waynesboro Hospital

62.    Western Missouri Medical Center

**Appellants:** All of the Plaintiffs listed above are also Appellants before this Court *except* the following three:

1.    Memorial Hospital of Sheridan County (number 31 listed above)

2.    Otero County Hospital Association, d/b/a Gerald Champion Regional Medical Center (number 35 listed above)

3.    Passavant Memorial Area Hospital Association d/b/a Passavant Area Hospital (number 37 listed above)

**Defendant-Appellee**:  There was only one defendant before the district court and that defendant is the only Appellee before this Court.

1.    Kathleen Sebelius (now Sylvia Mathews Burwell), in her official capacity as Secretary of the United States Department of Health and Human Services

**Amici for Plaintiffs**:  The following 13 parties were *amici* for the Plaintiffs before the district court:

1.    Knox Community Hospital

2.    Edward John Noble Hospital of Gouverneur, New York, Inc.

3.    Hanover Hospital, Inc.

4.    Hays Medical Center, Inc.

5.    Labette County Medical Center

iv

6.      Memorial Hospital Of Sweetwater County

7.      Mercy Hospital Lebanon

8.      Mercy Memorial Health Center, Inc.

9.      Newman Memorial County Hospital

10.     North Platte Nebraska Hospital Corporation

11.     Northwestern Medical Center Inc.

12.     Pocatello Hospital, LLC

13.     Richmond Memorial Hospital

**B.     Rulings Under Review.**

The ruling at issue in this Court is the Order that the Hon. Rosemary M. Collyer of the United States District Court for the District of Columbia entered on March 21, 2014 entering judgment for the Defendant, granting summary judgment to the Defendant, and denying Plaintiffs' motion for summary judgment. That Order is docket entry number 50. The associated Opinion, also entered on March 21, 2014, is docket entry number 49 and has been published at 2014 WL 1118262. Also, this appeal seeks review of all interlocutory orders merged into such Judgment, including but not limited to the Order entered on March 27, 2013 (R. 45), as well as the Opinion entered on March 27, 2013 (R. 44) and published at 935 F. Supp. 2d 121. Appellants are not aware of any citation to an official publication of the Orders.

**C.     Related Cases.**

This case has not previously been before this Court or any other court other than the district court below. There are two related cases involving different plaintiffs currently stayed by the district court, pending final decision in this case:

1.     *Asante et al. v. Sebelius*, No. 1:11cv1689 (D.D.C.) (Collyer, J.); and

2.     *Ashley Valley Medical Center et al. v. Sebelius*, No. 1:13cv1030 (D.D.C.) (Collyer, J.).

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D. C. Circuit Rule 26.1, Appellants hereby certify that:

1.     Appellants have no parent companies. No publicly traded entity has a ten percent or greater ownership in any Appellant.

2.     Appellants are hospitals.

# CONTENTS

CERTIFICATE OF PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES ........................................................................ I

    A.    Parties and Amici ........................................................... i

    B.    Rulings Under Review .................................................... v

    C.    Related Cases ................................................................ vi

CORPORATE DISCLOSURE STATEMENT .................................... VI

GLOSSARY OF ABBREVIATIONS ................................................. 1

JURISDICTIONAL STATEMENT .................................................... 1

STATEMENT OF ISSUES ............................................................... 1

STATEMENT OF THE CASE ........................................................... 2

    A.    Statutory Background and Structure ............................... 2

        1.    Congress Implemented the Inpatient Prospective Payment System for Medicare Payments in 1983 ................. 2

        2.    Congress Protected Rural Hospitals From the Impact of Implementing the Prospective Payment System ..................... 4

        3.    SCHs and MDHs are Entitled to a "Hospital-Specific Rate" Which Differs from the Federal Rate ........................... 7

        4.    The Secretary's Budget-Neutrality Adjustments for DRG Weight Recalibrations ........................................... 10

    B.    The Secretary's Recent Challenged Methodology for the Rebased 2002 and 2006 Hospital-Specific Rates ........................... 12

        1.    The Secretary Initially Applied Adjustments Only for Years After the Base Year ........................................ 12

        2.    The Secretary Then Changed Her Original Instructions and Also Applied Adjustments for Years Before the Base Years ..................................................................... 12

C.      Procedural History ........................................................................14

SUMMARY OF ARGUMENT ........................................................................16

STANDARD OF REVIEW .............................................................................19

ARGUMENT ...................................................................................................20

I.     THE ADJUSTMENTS ARE CONTRARY TO LAW BECAUSE
THEY REDUCE HOSPITAL-SPECIFIC RATES FOR EVENTS
BEFORE THE BASE YEAR ....................................................................20

      A.    The Hospital-Specific Rate is the Hospital's Operating Costs in
the Base Year, Adjusted for Events After the Base Year; the
Secretary's Adjustments for Events Before the Base Year Are
Contrary to That Definition ...............................................................20

      B.    The Secretary's "Policy Decision" to Reduce the Target
Amount to Effectuate a "Meaningful Comparison" Is Contrary
to the Statute ......................................................................................24

II.    THE SECRETARY'S REDUCTION IN THE HOSPITAL-SPECIFIC
RATES IS ALSO CONTRARY TO THE STATUTORY BUDGET
NEUTRALITY REQUIREMENT, AND IS ARBITRARY AND
CAPRICIOUS ..........................................................................................26

      A.    The Pre-Base-Year Adjustments are Contrary to the Statutory
Directive that the Secretary Adjust DRG Weights ...........................26

      B.    The Secretary's Approach Is an Impermissible Construction
of the DRG Weight Budget-Neutrality Requirement and Is
Arbitrary and Capricious ...................................................................27

III.   THE SECRETARY WAS REQUIRED TO CHANGE HER
IMPLEMENTATION OF THE 2006 SCH BASE YEAR
THROUGH NOTICE-AND-COMMENT RULEMAKING ....................32

# AUTHORITIES

Page(s)

**Cases**

*Alaska Prof'l Hunters Ass'n, Inc. v. FAA,*
  177 F.3d 1030 (D.C. Cir. 1999) ................................................... 19, 33

*Cape Cod Hosp. v. Sebelius,*
  630 F.3d 203 (D.C. Cir. 2011) ........................................................ 27

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
  467 U.S. 837 (1984) ................................................................. 19, 28

*City of Arlington v. FCC,*
  133 S. Ct. 1863 (2013) ................................................................ 19

*EME Homer City Generation, LP v. EPA,*
  696 F.3d 7 (D.C. Cir. 2012), *rev'd on other grounds,*
  134 S. Ct. 1584 (2014) ................................................................. 25

*Methodist Hosp. of Sacramento v. Shalala,*
  38 F.3d 1225 (D.C. Cir. 1994) ...................................................... 2, 3

*Motor Vehicle Mfrs. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ............................................................ 20, 31, 32

*Nat'l Ass'n of Food Chains, Inc. v. ICC,*
  535 F.2d 1308 (D.C. Cir. 1976) ..................................................... 20

*Southern S.S. Co. v. NLRB,*
  316 U.S. 31 (1942) ...................................................................... 29

*Util. Air Regulatory Grp. v. EPA,*
  134 S. Ct. 2427 (2014) ................................................................ 19

*Util. Solid Waste Activities Grp. v. EPA,*
  236 F.3d 749 (D.C. Cir. 2001) ....................................................... 34

**Statutes**

5 U.S.C. § 706 ................................................................................1, 26

28 U.S.C. § 1291 ..................................................................................1

28 U.S.C. § 1331 ..................................................................................1

42 U.S.C. § 1395oo(f)(1) ....................................................................14

*42 U.S.C. § 1395ww(b)(3)(C) ..............................................7, 9, 17, 21

42 U.S.C. § 1395ww(d)(3) ....................................................................7

*42 U.S.C. § 1395ww(d)(4)(C) .......................................................10, 26

42 U.S.C. § 1395ww(d)(5)(D) ......................................................4, 7, 8

Balanced Budget Refinement Act of 1999, Pub. L. No. 106-113,
     App. F, § 411, 113 Stat. 1501, 1501A-377 (1999) ................................5

*Deficit Reduction Act of 2005, Pub. L. No. 109-171,
     § 5003(b), 120 Stat. 4 (2006) .............................................................8

*Medicare Improvements for Patients and Providers Act of 2008,
     Pub. L. No. 110-275, § 122, 122 Stat. 2494 (2008) .............................8

Medicare, Medicaid, and State Children's Health Insurance Program
     Balanced Budget Refinement Act of 1999, Pub. L. No. 106-113,
     § 405, 113 Stat. 1501 (1999) ...............................................................8

Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, §
     6003(f), 103 Stat. 2106 (1989) ...........................................................8

Social Security Amendments of 1983,
     Pub. L. 98-21, 97 Stat. 65 (1983) ......................................................4

x

## Other Authorities

*Hospital Inpatient Prospective Payments Systems for Acute Care Hospitals and the Long Term Care Hospital Prospective Payment System Changes and FY2011 Rates*,
75 Fed. Reg. 50,042 (Aug. 16, 2010) ....................................................3

*Changes to the Hospital Inpatient Prospective Payment Systems for Acute Care Hospital and Fiscal Year 2010 Rates*,
74 Fed. Reg. 43,754 (Aug. 27, 2009) ..................................................14

*Proposed Changes to the Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals and Fiscal Year 2012 Rates*,
74 Fed. Reg. 24,080 (May 22, 2009) ...................... 10, 11, 14, 13, 22, 24, 26, 29

*Prospective Payment for Medicare Inpatient Hospital Services*,
49 Fed. Reg. 234 (Jan. 3, 1984) .........................................................7

*Prospective Payments for Medicare Inpatient Hospital Services*,
48 Fed. Reg. 39,752 (Sept. 1, 1983) ....................................4, 7, 24, 31

MedPAC, *Report to the Congress: Medicare and the Health Care Delivery System* (June 2012) .......................6, 23

MedPAC, *Report to the Congress: Medicare in Rural America* (June 2001) ............................................5

Joint-Signature Memorandum to Fiscal Intermediaries and Medicare Administrative Contractors (Nov. 17, 2008) ..............................13, 33

Change Request 6189, CMS Manual System, Medicare Claims Processing, Transmittal 1610 (Oct. 3, 2008). .................12, 33

Change Request 5276, CMS Manual System, Medicate Claims Processing, Transmittal 1067 (Sept. 25, 2006) ......................12

Authorities upon which Appellants chiefly rely
are marked with asterisks.

## GLOSSARY OF ABBREVIATIONS

**CMS**         Centers for Medicare and Medicaid Services

**DRG**         Diagnosis-Related Group

**IPPS**        Inpatient Prospective Payment System

**MDH**         Medicare-Dependent Hospital

**SCH**         Sole Community Hospital

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction over this case under 28 U.S.C. § 1331 because the case arises under the laws of the United States governing administrative procedure, 5 U.S.C. § 706, and the Medicare program, 42 U.S.C. §§ 1395 *et seq*. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291. The district court issued its final judgment on March 21, 2014, and Appellants timely filed their notice of appeal on May 19, 2014.

## STATEMENT OF ISSUES

1.      Congress protected rural hospitals by providing them a special payment rate that is to be their own costs in specified base years. Congress authorized adjustments for inflation *after* the base year. The question presented in this case is whether the Secretary could apply adjustments to new base-year rates for events that occurred *before* those new base years.

2.     Whether the Secretary could unilaterally change her published methodology for the 2006 SCH base year to include such adjustments without giving affected hospitals notice of the changed methodology, or an opportunity to comment.

## STATEMENT OF THE CASE

**A.     Statutory Background and Structure.**

**1.     Congress Implemented the Inpatient Prospective Payment System for Medicare Payments in 1983.**

Medicare is a federal health-insurance program for the aged and disabled. *See* 42 U.S.C. ch. 7, subch. XVIII. It was created in 1965 and is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the United States Department of Health and Human Services over which Secretary Sylvia Mathews Burwell, the defendant-appellee here, presides.

As a health-insurance program, Medicare pays hospitals and physicians for providing healthcare services to beneficiaries. Congress specifies how CMS is to determine those payment amounts. At issue in this case are Medicare payments to certain vulnerable rural hospitals for inpatient services, such as nursing care, board, and drugs, furnished to program beneficiaries.

In 1983, Congress revised the payment system for those services by establishing the "inpatient prospective payment system". *See Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1226–27 (D.C. Cir. 1994) (discussing

2

legislative history). Before that, Medicare paid hospitals the costs of services provided; but under the prospective payment system, hospitals receive payment according to prospectively set rates and the patient's diagnosis. *Id.* at 1227. This system is intended to limit Medicare program costs and to "encourage health care providers to improve efficiency and reduce operating costs." *Id.* (citing H.R. Rep. No. 98-25, at 132 (1983), *reprinted in* 1983 U.S.C.C.A.N. 219, 351; S. Rep. No. 98-23, at 53, *reprinted in* 1983 U.S.C.C.AN. 143, 193).

Congress has dictated the methodology for calculating payments under the prospective payment system. 42 U.S.C. § 1395ww, *et seq.* At its basic level, it is a two-step process. First, the Secretary establishes a payment rate. Next, she classifies possible diagnoses into diagnosis-related groups ("DRGs") and assigns each group a numerical weight reflecting the estimated relative cost for hospitals to treat diagnoses within that group. When a patient is discharged, the Secretary multiplies the payment rate by the DRG weight applicable to that patient's diagnosis. The product is the payment that the hospital will receive for treating that patient.[1]

---

[1] DRG weights can increase or decrease the base payment rate depending on the severity of the diagnoses. For example, under the 2011 DRGs, the weight for a less-costly headache was 0.6701, which would result in a payment significantly below the base rate. On the other hand, the weight for a very-costly heart transplant was 13.6127, which would result in a payment far above the base rate. *See Hospital Inpatient Prospective Payments Systems for Acute Care Hospitals and the*

3

### 2.    Congress Protected Rural Hospitals From the Impact of Implementing the Prospective Payment System.

As Congress mandated the shift from cost-based reimbursement, which prevailed before 1983, to a prospective payment system, under which hospitals would be paid a fixed amount per episode of care (or per discharge), Congress worried about the dangers of this rigorous fixed payment system on certain hospitals that were viewed as both vulnerable and vital to the success of the Medicare program. It therefore required special treatment for hospitals defined as either a sole community hospital or a Medicare-dependent, small rural hospital. Sole community hospitals are isolated hospitals that are the only source of hospital services in their communities. *See* 42 U.S.C. § 1395ww(d)(5)(D)(iii) (defining SCHs). Medicare-dependent, small rural hospitals are rural hospitals that treat a large percentage of Medicare patients. *See id.* § 1395ww(d)(5)(G)(iv) (defining MDHs).

The Social Security Amendments of 1983, Pub. L. 98-21, require the Secretary "to take into account the special needs of [sole community hospitals] by using a special payment formula for hospitals so classified." *Prospective Payments*

---

*Long Term Care Hospital Prospective Payment System Changes and FY2011 Rates*, 75 Fed. Reg. 50,042 (Aug. 16, 2010) (Table 5), *available at* http://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/AcuteInpatientPPS/FY-2011-IPPS-Final-Rule-Home-Page-Items/CMS1237948.html (download .zip file for Table 5).

*for Medicare Inpatient Hospital Services*, 48 Fed. Reg. 39,752, 39,780 (Sept. 1, 1983) (The Medicare-dependent Small Rural Hospital program was created later, in 1990). The Medicare Payment Advisory Commission ("MedPAC") an independent federal body established by Congress to advise on Medicare issues, has explained that in order to support rural hospitals that "are important or solitary sources of medical services," and to "maintain access to needed health services for beneficiaries in isolated communities," the Sole Community Hospital program

> provides higher payments to hospitals that are geographically isolated—and thus are believed to play a critical role in providing access to acute care—*and that had above-average costs in a base year for the mix of patients they served.*

MedPAC, *Report to the Congress: Medicare in Rural America* 34, 58–59 (June 2001) (emphasis added).[2]

The Medicare-dependent, small rural hospital program was designed to provide financial protection to hospitals for which Medicare revenue make up a large share of total revenues. As MedPAC explained, "These hospitals were believed to be more vulnerable to inadequate payments under the PPS than otherwise similar rural facilities." *Id.* Congress sought to ensure the viability of

---

[2] MedPAC published the cited report in response to a Congressional directive to "examine and evaluate the adequacy and appropriateness of the categories of special payments (and payment methodologies) established for rural hospitals under the Medicare program, and the impact of such categories on beneficiary access and quality of health care services." Balanced Budget Refinement Act of 1999, Pub. L. No. 106-113, App. F, § 411, 113 Stat. 1501, 1501A-377 (1999).

these hospitals because if they were to fail, the communities they serve would be left without hospital services.

Because SCHs and MDHs face unique economic challenges, are critical sources of healthcare in their communities, and are critical to the success of the Medicare program, Congress mandated that the Secretary ensure their viability by establishing a number of payment protections. MedPAC explained

> The primary benefit of SCH status is to have inpatient payments based on the provider's historic costs and updated for inflation. The SCH can pick among several years to set its historic costs, and it picks the highest cost year on which to base payments. [T]he SCH program sets rates based on historic costs trended forward (rather than current costs) . . . .

MedPAC, *Report to the Congress: Medicare and the Health Care Delivery System* 159 (June 2012). In this manner, SCHs and MDHs are still paid on a prospective basis, but using payment rates that are their costs in a base year inflated forward, rather than using the national average costs of all hospitals in a base year, which is used to determine payment for most other types of hospitals.

Indeed, sometimes, SCHs and MDHs are provided even further financial protection, and are not paid a prospective rate at all. Congress provided that in some instances, these hospitals may be paid the actual costs they incur in a given year, rather than a prospective per-case payment. In one example of several special protections afforded by Congress to these hospitals, if an SCH or MDH experiences a decrease of more than 5 percent in its total number of inpatient cases

6

due to circumstances beyond its control, then the Secretary must "fully compensate" the SCH or MDH for its costs. 42 U.S.C. § 1395ww(d)(5)(D)(ii) (SCHs), *id.* § 1395ww(d)(5)(G)(iii) (MDHs). Other hospitals enjoy no such protection from the Prospective Payment System.

### 3. SCHs and MDHs are Entitled to a "Hospital-Specific Rate" Which Differs from the Federal Rate.

Most hospitals use the "federal rate" as their payment rate. The federal rate is essentially the *national average* of per-discharge costs of *all hospitals* in 1981, adjusted annually. *See* 42 U.S.C. § 1395ww(d)(3) (describing the federal rate);[3] *see also Prospective Payments for Medicare Inpatient Hospital Services*, 48 Fed. Reg. 39,752, 39,763–64 (Sept. 1, 1983).

But for SCHs and MDHs, the Secretary must use a "hospital-specific rate" (called the "target amount" in the statute), which is defined in the statute as the *actual costs* of *the particular hospital* in one of several statutorily specified base years, if that rate is higher than the federal rate. *See* 42 U.S.C. § 1395ww(b)(3)(C) and (D) (defining target amount as "the allowable operating costs of inpatient hospital services . . . for the hospital for [the base cost reporting period]").[4] An

---

[3] The federal rate is referred to as the "national adjusted prospective payment rate" in the statute.

[4] At the outset of the prospective payment system, all hospitals were paid the hospital-specific rate during a transition period to the federal rate. *See Prospective Payment for Medicare Inpatient Hospital Services*, 49 Fed. Reg. 234, 259–62 (Jan.

SCH's payment rate is the target amount, if it exceeds the federal rate. 42 U.S.C. § 1395ww(d)(5)(D)(i); *id.* § 1395ww(b)(3)(I), (L). An MDH's payment rate is equal to the federal rate plus 75-percent of the amount by which the target amount exceeds the federal rate. *Id.* § 1395ww(d)(5)(G)(i) and (ii); *id.* § 1395ww(b)(3)(K). To calculate payments, these hospital-specific payment rates are multiplied by the DRG weights for the patients the hospital serves to calculate payments.

From time to time, Congress has provided SCHs and MDHs the right to use their costs from a more recent year to calculate their target amounts, if doing so will result in a higher payment than any of the previous base years. The original base year for these hospitals was 1982. Congress then added 1987 to determine target amounts for SCHs and MDHs,  *See* Omnibus Budget Reconciliation Act of 1989 ("OBRA"), Pub. L. No. 101-239, § 6003(f), 103 Stat. 2106 (1989). In 2006, Congress added 2002 as an additional "base year" for MDHs. *See* Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 5003(b), 120 Stat. 4 (2006) (codified at 42 U.S.C. § 1395ww(b)(3)(K)). For SCHs, Congress also added 1996 and 2006 as new base years. *See* Medicare, Medicaid, and State Children's Health Insurance Program Balanced Budget Refinement Act of 1999, Pub. L. No. 106-113, § 405, 113 Stat. 1501 (1999); Medicare Improvements for Patients and

---

3, 1984). Today, only SCHs and MDHs continue to be paid the hospital-specific rate.

Providers Act of 2008, Pub. L. No. 110-275, § 122, 122 Stat. 2494 (2008). In sum, the Secretary is required to use whoever of the following base years yields the highest payment: 1982, 1987, 1996, or 2006 for SCHs, and 1982, 1987, or 2002 for MDHs. Each of the appellants in this case was entitled to be paid rates calculated using their costs in 2006 (for the SCHs) or 2002 (for the MDHs).

To compute a hospital's payment rate with a given base year, the Secretary takes the sum of the hospital's actual costs for that base year and divides it by the average DRG weight for the hospital's patients in that base year. (*See* D.E. 36 at 1–2.) This step neutralizes the effect of the hospital's particular patient mix, yielding a dollar amount that reflects standardized base-year costs. This number is used as the hospital's payment rate.

The statute provides for the Secretary to adjust the hospital's costs in the base year by "applicable percentage increases . . . for cost reporting periods *after* the base cost reporting period and up to and including such first 12-month reporting period." 42 U.S.C. § 1395ww(b)(3)(C)(i)(II) (emphasis added).

For payment years beginning with fiscal year 2009 for SCHs and fiscal year 2010 for MDHs, however, the Secretary has been decreasing 2006- and 2002-based target amounts for events *before* the relevant base cost reporting period, as described in more detail in subsection 5 below. This case challenges those reductions as contrary to the statute and arbitrary.

9

#### 4.  The Secretary's Budget-Neutrality Adjustments for DRG Weight Recalibrations.

The costs associated with providing inpatient hospital services for different diagnoses may change over time as hospitals implement new treatments that are more or less costly than the old treatments. For this reason, since 1988 Congress has required the Secretary to annually recalibrate the DRG weights "to reflect changes in treatment patterns, technology . . . and other factors which may change the relative use of hospital resources." 42 U.S.C. § 1395ww(d)(4)(C)(i). Since 1991, Congress has required that this annual recalibration of DRG weights be budget neutral—i.e., that it not cause an increase or decrease in overall Medicare payments. *Id.* § 1395ww(d)(4)(C)(iii) ("Any such adjustment under clause (i) for discharges in a fiscal year (beginning with fiscal year 1991) shall be made in a manner that assures that the aggregate payments under this subsection for discharges in the fiscal year are not greater or less than those that would have been made for discharges in the year without such adjustment.").

The Secretary attempted to fulfill this statutory directive by recalibrating DRG weights in a manner that keeps them normalized, meaning that the *average* weight of all DRGs after recalibration is equal to the average weight before recalibration. She found, however, that this is insufficient to achieve budget neutrality. *See Proposed Changes to the Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals and Fiscal Year 2012 Rates*, 74 Fed. Reg.

10

24,080, 24,184 (May 22, 2009) (Proposed Rule) ("While [normalization] is intended to ensure that recalibration does not affect total payments to hospitals under [the Prospective Payment System], our analysis has indicated that the normalization adjustment does not achieve budget neutrality with respect to aggregate payment to hospitals.").

Thus, the Secretary's recalibration of DRG weights does not result in budget-neutral payments. To compensate, the Secretary decided to make a second adjustment to payment rates rather than to DRG weights. Therefore, in addition to normalizing the DRG weights, the Secretary also reduces payment *rates* by a "budget-neutrality factor." *See* 74 Fed. Reg. at 24,184 (stating that the subsequent budget-neutrality adjustment to payment rates "ensures that the recalibration process does not inadvertently increase total payments to hospitals"). The budget-neutrality factor is almost always a number slightly less than one and therefore has the effect of reducing payment rates. For example, the budget-neutrality factor for 2007 was 0.997395, which reduced payments by about 0.3%.

In short, the Secretary has been gradually adjusting hospital payment rates to compensate for the fact that the DRG weights are not recalibrated in a budget neutral manner.

**B.    The Secretary's Recent Challenged Methodology for the Rebased 2002 and 2006 Hospital-Specific Rates.**

**1.    The Secretary Initially Applied Adjustments Only for Years After the Base Year.**

After Congress added 2002 as a new base year for MDHs in 2006, CMS published implementing instructions for its fiscal intermediaries—the name for private contractors who process and make claims for Medicare payments. The instructions directed the fiscal intermediaries, as part of their calculation, to update the 2002 base year by multiplying the base-year costs by all the budget-neutrality factors for the years *after* 2002 and through the payment year: 2003, 2004, 2005, 2006, and 2007. *See* Change Request 5276, CMS Manual System, Medicate Claims Processing, Transmittal 1067 at 4 (Sept. 25, 2006) (Rulemaking Record 1213, 1217). The Secretary did not apply budget neutrality factors for any year *before* the 2002 base year.

Two years later, in 2008, after Congress added 2006 as a new base year for SCHs, CMS published similar instructions: multiply the payment rates by budget-neutrality factors for the years *after* the base year. *See* Change Request 6189, CMS Manual System, Medicare Claims Processing, Transmittal 1610 (Oct. 3, 2008).

**2.    The Secretary Then Changed Her Original Instructions and Also Applied Adjustments for Years *Before* the Base Years.**

After publishing the instructions for the 2006 base year for SCHs, however, and unbeknownst to affected hospitals, the Secretary sent a nonpublic

12

memorandum to fiscal intermediaries changing course. The new instructions
directed the fiscal intermediaries to apply budget-neutrality factors from all
years—both *before* and *after* the base year. The instructions characterized this step
as "updating" the 2006 base year costs to 2007 dollars: "the [target amount]
computed from the FY 2006 cost report data shall be updated to FY 2007 dollars . .
. by applying an update factor adjustment of 1.034 for FY 2007, and the following
budget neutrality adjustments [listing the budget neutrality adjustments for 1993 to
2007]." *See* Joint-Signature Memorandum to Fiscal Intermediaries and Medicare
Administrative Contractors (Nov. 17, 2008) (Rulemaking Record 1209).
Collectively, these additional budget-neutrality adjustments from before the base
year had the effect of reducing the 2006 base-year payment rates by an additional
2.3%. SCHs only learned of this reduction as they began receiving their rate
notices in December 2008. Even then, the reduction was not explained; the
hospitals saw only that the rate was lower than anticipated under the Change
Request.

Shortly thereafter, the Secretary changed her existing practice for the MDH
2002 base year as well, and applied budget-neutrality factors for *before* the base
year (from 1993 through 2002). *See Proposed Changes to the Hospital Inpatient
Prospective Payment Systems for Acute Care Hospitals and Fiscal Year 2012*

*Rates*, 74 Fed. Reg. 24,080, 24,184 (May 22, 2009) (Proposed Rule). [5] The

Secretary received 38 comments on this proposal—including from the Federation

of American Hospitals, the American Hospital Association, and the Rural Referral

Center & Sole Community Hospital Coalition. Every one of them opposed it as

contrary to the Medicare statute and arbitrary, including for SCHs.

Notwithstanding these objections, the Secretary finalized her proposed rule for

MDHs. *See Changes to the Hospital Inpatient Prospective Payment Systems for*

*Acute Care Hospital and Fiscal Year 2010 Rates*, 74 Fed. Reg. 43,754, 43,895–97

(Aug. 27, 2009) (Final Rule). The budget-neutrality factors from before the 2002

base year have the effect of reducing MDH 2002 base-year hospital-specific rates

by 1.8%.

The Secretary did not issue any notice-and-comment rulemaking for SCHs,

but has simply continued the practice adopted in the 2008 Joint Signature

Memorandum.

### C.     Procedural History.

Appellant hospitals appealed the Secretary's reduction of their base-year

costs by budget-neutrality factors from before the base year to the Provider

Reimbursement Review Board and sought expedited judicial review under 42

---

[5] The Federal Register pages referred to these pre-base year adjustments as
"cumulative budget neutrality factors." 74 Fed. Reg. at 24,184.

U.S.C. § 1395oo(f)(1) and 42 C.F.R. § 405.1842. The Board concluded that it

lacked jurisdiction, but that if it did have jurisdiction, expedited judicial review

would be appropriate. Appellant hospitals appealed the Board's decision on

jurisdiction to the Administrator of CMS, but she failed to act within the sixty days

allotted for her to reverse, affirm, or modify the Board's determination. *See id.*

§ 1395oo(f)(1).

    The hospitals filed this lawsuit in the United States District Court for the

District of Columbia in February 2011. In March 2013, the court granted in part

and denied in part the Secretary's motion for summary judgment. She held that the

Secretary was not required to engage in rulemaking when issuing the Joint

Signature Memorandum's revised rebasing instruction for SCHs in November

2008. (D.E. 44 at 26.) But the court denied without prejudice both parties'

summary judgment motions with respect to whether or not the Secretary's

application of pre-base-year budget-neutrality factors violated the Administrative

Procedure Act and ordered further briefing on that issue. (*Id.* at 22–23.) A year

later, in March 2014, the court granted the Secretary's motion for summary

judgment in full and denied appellants' motion. It held that it was possible to read

the statute as either forbidding or permitting the Secretary's adjustments, and so

deferred to the Secretary's interpretation. (D.E. 49 at 24.) The court held that the

Secretary's adjustments were within her discretion and comport with the statutory directive that she achieve budget neutrality. (*Id.* at 25.)

This appeal followed.

## SUMMARY OF ARGUMENT

Before 1983, Congress paid hospitals their actual costs of providing services to Medicare patients. In 1983, Congress changed the payment methodology to make a fixed payment per case depending on the patient's diagnosis. Congress was concerned about the impact of this new system on certain rural hospitals, so it created an alternative payment methodology using a "hospital-specific" rate (referred to in the statute as the "target amount"). Congress defined the target amount as the hospitals' own costs in the base year of 1982, adjusted for inflation after 1982. Other hospitals are paid a standard "federal rate."

Congress has periodically reset the target amount to be the hospital's costs in new base years, adjusted for inflation after those base years. At issue in this case is the Secretary's implementation of new congressionally-enacted base years: 2002 for Medicare-dependent, small rural hospitals and 2006 for sole community hospitals.

In both instances, the Secretary reversed a prior methodology and applied adjustments to the hospital-specific rate for events *before* the base year.

16

1.      These adjustments for events *before* the base year are contrary to the plain language defining the target amount. Congress specified that the hospital-specific rates for\ SCHs and MDHs would be the hospital's costs in a specified base year, adjusted for events *after* the base year, 42 U.S.C. § 1395ww(b)(3)(C)(i)(I) and (II) (target amount for SCHs), *id.* § 1395ww(b)(3)(D)(i)(I) and (II) (target amount for MDHs), if that amount resulted in higher payments. Congress has reset this calculation to the hospital's costs in more recent base years, starting anew with the hospital's costs in 2002 or 2006. Despite this congressional reset, the Secretary applied adjustments to the 2002 and 2006 base-year target amounts for events *before* the base year, thereby contravening Congress's rebasing. The Secretary's asserted "policy decision" to effectuate a "meaningful comparison" between the federal rate and the hospital-specific rate is unmoored from the statute, in which Congress expressly defined the two rates and their relationships.

2.      The pre-base-year adjustments are not compelled by, and indeed are contrary to, the DRG weight recalibration budget-neutrality command as well. The Secretary's decision to adjust *rates*, rather than DRG *weights*, is contrary to the statutory directive that the annual recalibration of the DRG weights (not the rates) "shall be made in a manner that assures . . ." budget-neutral payments.

17

1395ww(d)(4)(c)(iii). Even if the statute is ambiguous on this point, the Secretary's chosen method is impermissible and arbitrary and capricious.

First, the Secretary's chosen method violates Congress's rebasing of the target amount to a more recent year. Second, the phenomenon that the Secretary's method purports to adjust for—an increase in DRG weights from 1993 to the base year—is redundant and duplicative because any such increase has already reduced the target amount because of the way the hospital-specific rate is calculated.

Finally, the Secretary's mechanical assertion that she is implementing a "long-standing policy" decision reveals that she has failed to consider an important aspect of the problem. The policy decision she cites (and that the district court relied upon) applied budget-neutrality factors equally to the federal and hospital-specific rates but dealt only with years *after* the base years. This policy is not in dispute and is not the subject of this case. The Secretary's reliance on this policy reveals her failure to recognize and address the unique issues involved in applying pre-base-year adjustments when calculating new base-year rates enacted after 1993.

3.      In addition to being substantively unlawful, the Secretary's changed policy for the SCH 2006 base year was procedurally improper. The Secretary initially announced that only post-2006 budget-neutrality adjustments would be applied. Subsequently, the Secretary changed this directive, but did so without

18

notifying hospitals and without seeking comment on the change. But having given a "definitive interpretation, and later significantly revise[d] that interpretation, the agency has in effect amended its rule, something it may not accomplish without notice and comment." *Alaska Prof'l Hunters Ass'n, Inc. v. FAA*, 177 F.3d 1030, 1034 (D.C. Cir. 1999).

## STANDARD OF REVIEW

This Court evaluates the Secretary's interpretation of the Medicare Act under the framework in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984), under which the first question is "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If it has, the Court "must give effect to the unambiguously expressed intent of Congress." *Id.* at 843. If the Court finds the statute to be ambiguous, it must determine whether the agency's interpretation is reasonable and "within the bounds of its statutory authority." *City of Arlington v. FCC*, 133 S. Ct. 1863, 1868 (2013). In doing so, the Court must ensure that the agency's interpretation accounts "for both the specific context in which language is used and the broader context of the statute as a whole." *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2442 (2014).

To determine if agency action is arbitrary and capricious, the Court must make a searching inquiry as to whether

19

the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983); *see also Nat'l Ass'n of Food Chains, Inc. v. ICC*, 535 F.2d 1308, 1314

(D.C. Cir. 1976) ("This court repeatedly has emphasized, however, that an agency

must demonstrate that it has really taken a hard look at the salient problems, and

has . . . genuinely engaged in reasoned decision-making.") (citations and

quotations omitted).

## ARGUMENT

**I.    THE ADJUSTMENTS ARE CONTRARY TO LAW BECAUSE THEY REDUCE HOSPITAL-SPECIFIC RATES FOR EVENTS *BEFORE* THE BASE YEAR.**

**A.    The Hospital-Specific Rate is the Hospital's Operating Costs in the Base Year, Adjusted for Events *After* the Base Year; the Secretary's Adjustments for Events *Before* the Base Year Are Contrary to That Definition.**

The Secretary's pre-base-year reductions violate Congress's definition of the

target amount, which is the hospital's costs in a specified base year, adjusted for

events (e.g., inflation) *after* the base year. Although Congress reset the target

amounts to rural hospitals' costs in 2002 or 2006, the Secretary has impermissibly

reduced the rate for events *before* those new base years.

20

Specifically, Congress expressly defined the target amount as having two

key components:

> (1) "the allowable operating costs of inpatient hospital services … for the hospital *for … the base cost reporting period*";
>
> (2) increased by the "applicable percentage increases … for cost reporting periods *after the base cost reporting period*"

42 U.S.C. § 1395ww(b)(3)(C)(i)(I) and (II) (target amount for SCHs), *id.*

§ 1395ww(b)(3)(D)(i)(I) and (II) (target amount for MDHs) (emphases added)).[6]

Through statutory amendments, Congress has provided for new "base cost

reporting periods" (base years) of 2002 for MDHs, *id.* § 1395ww(b)(3)(K), and

2006 for SCHs, *id.* § 1395ww(b)(3)(L).

Congress's enactment of the 2002 and 2006 base years followed its practice

of periodically resetting target amounts to hospitals' costs in a more recent base

year, if doing so would result in higher payments to those hospitals. Through the

legislation enacting these new base years, Congress provided a fresh start using the

hospital's costs in the new base year. And although the statute provides for

---

[6] As described above, and in the District Court's opinion, SCH's payment rates are the 2006 base year target amount (*see* 42 U.S.C. § 1395ww(b)(3)(L) (substituting the 2006 base year target amount for the amount otherwise determined under § 1395ww(d)(5)(D)(i)) if that amount is higher than rates using other base years, and higher than the federal rate). MDH's payments are equal to the federal rate plus "75 percent of the amount by which the hospital's target amount . . . exceeds [the federal rate]." *Id.* § 1395ww(d)(5)(G)(i), (ii).

updating the target amount for events *after* the specified base year, nothing

authorizes reductions in the target amount for events *before* the base year.

Despite all this, the Secretary reduced target amounts for events that

occurred *before* the relevant base years, *i.e.,* before 2002 for MDHs—specifically,

"DRG changes from FYs 1993 through 2002," *Proposed Changes to the Hospital*

*Inpatient Prospective Payment Systems for Acute Care Hospitals and Fiscal Year*

*2010 Rates*, 74 Fed. Reg. 24,080, 24,184 (May 22, 2009) (emphasis added), and

DRG changes from fiscal years 1993 through 2006 for SCHs.

But the statute is unambiguous that the target amount is the hospitals'

operating costs *in the specified base year,* which is then brought forward to the

payment year for events occurring *"after"* the base year. Unlike the federal rate,

the target amount was not set at the inception of the Prospective Payment System

in 1983 and simply inflated and adjusted each year from that point forward. Rather,

the target amount starts fresh with the hospitals' reported costs in the

congressionally-specified base year, and then, like the federal rate, inflated from

that point forward for subsequent events occurring "after" that year. The effect and

purpose of a new base year is to reset the hospital-specific rate to the hospital's

costs during that new base cost reporting period—thus, eliminating the effect of

events that came before. As MedPAC has explained, "The primary benefit of SCH

status is to have inpatient payments based on the provider's historic costs and

22

updated for inflation. The SCH can pick among several years to set its historic costs, and it picks the highest cost year on which to base payments."  MedPAC, *Report to the Congress: Medicare and the Health Care Delivery System* 159 (June 2012).

Adjusting hospital-specific rates for events in cost reporting periods *before* the specified base year not only violates the congressional command to use the hospital's costs in a specific new base year, and nullifies the word "*after,*" but also nullifies the very concept of rebasing.

The Secretary initially applied adjustments only for years *after* the base year, consistent with the statutory scheme. But when the Secretary changed course and applied adjustments for events *before* the base year, she apparently recognized that the change in course deviated from the statute, and accordingly incorrectly characterized these pre-base-year adjustments as "updates" to bring the 2006 base-year costs forward.[7]

For rural hospitals struggling to withstand pressures caused by lower and uneven volume and other financial constraints, and which Congress insulated from

---

[7] Joint-Signature Memorandum to Fiscal Intermediaries and Medicare Administrative Contractors (Nov. 17, 2008) (Rulemaking R. 1209) (the hospital-specific rate "computed from the FY 2006 cost report data shall *be updated to FY 2007 dollars* . . . by applying an update factor adjustment of 1.034 for FY 2007, and the following budget neutrality adjustments [listing the budget neutrality adjustments for 1993 to 2007]."

the rigid constriction of the Prospective Payment System, the effect is substantial.

The Secretary's adjustments for *before* the base year improperly reduced the 2006

base-year hospital-specific rates for SCHs, and the 2002 base-year hospital-

specific rates for MDHs, by 2.33% and 1.74%, respectively.

### B.     The Secretary's "Policy Decision" to Reduce the Target Amount to Effectuate a "Meaningful Comparison" Is Contrary to the Statute.

The Secretary's justification of the pre-base-year reductions as a "policy

decision" to promote "a meaningful comparison between payments under the

Federal rate, which is adjusted by the cumulative budget neutrality factor, and

payments based on the hospital-specific rate" is contrary to the statute and nullifies

the comparison that Congress defined. 74 Fed. Reg. at 24,184. The comparison

specified by statute is the only "meaningful" one for the Secretary to implement.

On one side of the statutory rate comparison[8] is the federal rate—a national

rate not tied to a particular hospital's costs. That rate was initially set in 1983,

using the 1981 average operating costs of *all* hospital nationwide. *See Prospective*

*Payments for Medicare Inpatient Hospital Services*, 48 Fed. Reg. 39,752, 39,763–

64 (Sept. 1, 1983). Each year, that rate is carried forward and updated for inflation

---

[8] The Secretary refers to a "comparison," though in fact MDHs are paid the federal rate plus 75% of the difference between the two rates. The statute specifies this formula, not a comparison.

to the current year. Congress has never directed that the federal rate be reset to start anew.

On the other side of the rate comparison is the hospital-specific rate—which was originally the hospital's own costs in 1982. Unlike the federal rate, however, Congress has specifically and intentionally reset the hospital-specific rate to the hospital's costs for new specified base years (1987, 1996, and 2006 for SCHs; 1987 and 2002 for MDHs), giving it a fresh start.

The Secretary's "policy decision" to make the comparison "meaningful" by reducing the hospital-specific rate for events *before* the base years, extending back to 1993, nullifies Congress's decision to re-set the hospital-specific rate and its definition of the relationship between the federal and hospital-specific rates.

The base year provisions of the statute are clear and unambiguous, and do not permit pre-base year adjustments. The Secretary may claim some ambiguity that permits them; however, even if there could possibly be some statutory ambiguity, the Secretary's approach falls outside "the boundaries of the statutory text." *EME Homer City Generation, LP v. EPA*, 696 F.3d 7, 23 (D.C. Cir. 2012), *rev'd on other grounds*, 134 S. Ct. 1584 (2014) (emphasis added). Here, the Secretary's "interpretation" (if it is one) bears no resemblance to the words used by Congress, and negates the words that it does use.

25

II.     **THE SECRETARY'S REDUCTION IN THE HOSPITAL-SPECIFIC
        RATES IS ALSO CONTRARY TO THE STATUTORY BUDGET
        NEUTRALITY REQUIREMENT, AND IS ARBITRARY AND
        CAPRICIOUS.**

The Secretary's application of the same set of pre-base-year reductions to
both the federal and hospital-specific rates is also contrary to the DRG weight
budget-neutrality provision of the statute, and arbitrary and capricious under the
Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

A.     **The Pre-Base-Year Adjustments are Contrary to the Statutory
       Directive that the Secretary Adjust DRG Weights.**

In addition to violating the target amount definitions as described above, the
Secretary's chosen method of implementing the DRG weight budget-neutrality
requirement also violates the statutory command that the Secretary annually
recalibrate the DRG weights to reflect changes in relative costs of conditions, 42
U.S.C. § 1395ww(d)(4)(C)(i), and that "*such adjustment* . . . shall be made in a
manner that assures . . ." budget neutrality, *id.* § 1395ww(d)(4)(C)(iii) (emphasis
added). But the manner in which she made the required DRG weight adjustments
was not budget neutral, as she explained. *See Proposed Changes to the Hospital
Inpatient Prospective Payment Systems for Acute Care Hospitals and Fiscal Year
2012 Rates*, 74 Fed. Reg. 24,080, 24,184 (May 22, 2009) (Proposed Rule) ("While
[normalization] is intended to ensure that recalibration does not affect total
payments to hospitals under [the Prospective Payment System], our analysis has

26

indicated that the normalization adjustment does not achieve budget neutrality with respect to aggregate payment to hospitals."). The Secretary has sought to compensate for this failure by adjusting payment *rates*, rather than DRG *weights*. But the statute is unambiguous that "such adjustment"—meaning the annual recalibrations to the DRG weights—are to be made in a manner that achieves budget neutrality.

It may be that the Secretary's departure from this clear statutory command would be permissible if it "had no practical effect" and the error was harmless. *See Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 212 (D.C. Cir. 2011) (declining to decide whether the statute required CMS "to achieve [an unrelated budget-neutrality requirement] only through adjustments to wage indexes" rather than to standardized amounts, where that "departure from the statutory language would have had no practical effect.") Here, however, the departure is meaningful as it has resulted in the pre-base year reductions at issue in this case. Had the Secretary simply adjusted DRG weights to be budget neutral, there would be no challenged adjustment to the hospital-specific rates.

## B. The Secretary's Approach Is an Impermissible Construction of the DRG Weight Budget-Neutrality Requirement and Is Arbitrary and Capricious.

Even if there is some ambiguity in the DRG weight budget-neutrality provision that permits budget neutrality to be achieved through adjustments to

rates, rather than solely through adjustments to weights, as the District Court concluded, (D.E. 49 at 24), the Secretary's chosen method, to the extent it applies pre base-year reductions to the hospital-specific rate, is not a reasonable construction of the statute under step two of *Chevron*, and is arbitrary and capricious.

      1.    The Secretary's approach violates the hospital-specific rate. The Secretary concedes that her chosen method of implementing the statutory DRG weight budget-neutrality requirement is not compelled by the statute. Her two-step method of first adjusting the DRG weights, and then reducing the target amounts and federal rates with factors back to 1993, is her own decision. [9] But this decision backs the Secretary into violating and nullifying another provision—the definition of the rebased target amounts. As shown above, applying pre-base year adjustments to reduce the target amount, even for budget neutrality purposes, contravenes the letter and purpose of Congress's re-basing. Even if there is some ambiguity as to the manner in which the Secretary may apply the budget neutrality provision, she may not apply it so single-mindedly as to violate the words or policy

_____

[9] The Secretary concedes she could have fulfilled her budget-neutrality mandate by reducing DRG Weights themselves if she wanted to. (*See* D.E. 46, Sec'y's Supp. Br. 6 ("It is true that the Secretary could, theoretically, apply the DRG budget neutrality adjustment to the DRG weights themselves . . . ").)

of another federal statute (*see Southern S.S. Co. v. NLRB*, 316 U.S. 31, 47 (1942)), and especially one enacted later.

2.    The Secretary's chosen methodology is unreasonable and arbitrary and capricious in that it subjects the hospital-specific rates to a redundant reduction. The Secretary characterizes her decision to apply budget-neutrality factors from before the base year as "account[ing] for DRG changes from FYs 1993 through 2002," referring to the increase in DRG Weights due to the fact that they are too-high for budget neutrality (or in the Secretary's words, "artificially high.") *See Proposed Changes to the Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals and Fiscal Year 2010 Rates*, 74 Fed. Reg. 24,080, 24,184 (May 22, 2009).

As the Secretary concedes, and as the district court correctly explained, when the Secretary annually "recalibrates" the DRG weights as required by the statute, those revised DRG weights do not result in budget neutral payments. *See Proposed Changes to the Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals and Fiscal Year 2012 Rates*, 74 Fed. Reg. 24,080, 24,184 (May 22, 2009) (Proposed Rule) ("While [normalization] is intended to ensure that recalibration does not affect total payments to hospitals under [the Prospective Payment System], our analysis has indicated that the normalization adjustment does not achieve budget neutrality with respect to aggregate payment to hospitals

29

under [the Prospective Payment System].”); (D.E. 49 at 5–6.)  The DRG weights are left too-high for budget neutrality, and the Secretary takes a second step of reducing payment rates in order to achieve budget neutrality.

These too-high DRG weights from 1993 to the base year operate to reduce the hospital-specific rate and they do so in a straightforward mathematical manner. The hospital-specific rate is the hospital's costs in the base year divided by the average DRG weight of the patients the hospital served in the base year. (D.E. 49 at 9–10.)[10]

Had the Secretary adjusted the DRG weights themselves to be budget neutral, (as the Secretary concedes she could have done, and as the statute on its face appears to contemplate) DRG weights would necessarily have been lower on average. It is a simple and indisputable mathematical fact that a higher DRG weight in the denominator yields a smaller result. The quotient of 6 divided by 3 will be less than the quotient of 6 divided by 2. That same mathematical fact affects the hospital-specific rate. Dividing the hospital's costs by a *higher* average DRG weight (also known as the hospital's case-mix index) results in a *lower*

---

[10] In mathematical notation, using the 2006 base year as an example, this is simply:

$$\frac{\text{Hospital's 2006 Operating Costs}}{\text{Hospital's 2006 patients' Avg. DRG weight}}$$

hospital-specific rate. Conversely, "[t]he lower the case-mix index, the greater the hospital-specific [rate]." 48 Fed. Reg. at 39,773 (Sept. 1, 1983).

Thus, the effect of not fully adjusting the DRG weights from 1993 to the base year is a higher hospital-specific average DRG weight in the denominator, and a lower hospital-specific rate than if the Secretary had achieved budget neutrality by adjusting the weights themselves.

The Secretary ignored this effect when she imposed the pre-base-year budget-neutrality factors, resulting in hospital-specific rates that are doubly reduced and therefore erroneously calculated to the unfair detriment of SCHs and MDHs. The federal rate contains no similar DRG weight in the denominator and is not similarly altered. By failing to address the unique impact of the higher DRG weights on lowering the hospital-specific rates, the Secretary fails to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, and is therefore arbitrary and capricious.

3.    The Secretary's claims to be implementing a "long-standing" policy judgment to apply budget neutrality factors identically to both rates, ignores the unique circumstance of a post-1993 base year hospital-specific rate and the definition of the target amount.

The district court's opinion relied heavily on the Secretary's claim to be implementing a "long-standing policy" decision. Critically, however, the Secretary

31

fails to recognize that her claimed long-standing policy (first articulated in 1990) to apply budget neutrality factors to both federal and hospital-specific rates meant applying budget neutrality factors *for years after the then-existing latest base year of 1987*. That policy of applying adjustments for years *after* the base year is not in dispute. The Secretary, however, has failed to recognize or address the unique issues that arose when Congress later enacted new base years, after the policy was initially articulated. The issue here is whether she is justified in applying adjustments for events that came *before* the new base years. The Secretary's mechanical recitation of the need to follow an inapposite long-standing policy "fail[s] to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, and is therefore arbitrary and capricious.

## III. THE SECRETARY WAS REQUIRED TO CHANGE HER IMPLEMENTATION OF THE 2006 SCH BASE YEAR THROUGH NOTICE-AND-COMMENT RULEMAKING.

In addition to the substantive violations above, the Secretary's 2006 base year implementing instruction was procedurally improper; the Secretary's change to her initial instruction applying only post base-year budget neutrality adjustments required notice and comment rulemaking.

The Secretary followed an unlawful process by first announcing publicly that she would adjust 2006 base-year hospital-specific rates only using budget-neutrality adjustments from *after* the base year. She then, however, changed this

directive and instructed Medicare contractors to also make budget-neutrality adjustments for *before* the base year. The Secretary's actions violated the notice-and-comment requirement of the Administrative Procedure Act. *See Alaska Prof'l Hunters Ass'n*, 177 F.3d at 1034  ("When an agency has given its regulation a definitive interpretation, and later significantly revises that interpretation, the agency has in effect amended its rule, something it may not accomplish without notice and comment.")

The Secretary originally published a Change Request applying only post-base year budget neutrality factors to 2006 base year costs for SCHs. Change Request 6189, CMS Manual System, Pub. 100-04 Medicare Claims Processing, Transmittal 1610 (Oct. 3, 2008). Then, in an unpublished, nonpublic memorandum to fiscal intermediaries and Medicare administrative contractors, the Secretary rescinded those instructions and directed fiscal intermediaries and Medicare administrative contractors to apply pre-base-year budget neutrality factors. Joint-Signature Memorandum to Fiscal Intermediaries and Medicare Administrative Contractors (Nov. 17, 2008) (Rulemaking R. 1209–12).

This change was a "significant revision" to a facially definitive interpretation from the agency – an interpretation that was consistent with how the Secretary had been implementing the 2002 MDH base year. As such, the changed interpretation required notice-and-comment rulemaking. The District Court relied

33

on an affidavit submitted by the Secretary that baldly asserted that the 2008 Change Request's clear instruction was a "mistake." The Court should disregard that affidavit as outside the record. In any case, the Secretary's interpretation that was made known to hospitals, was definitive and authoritative; irrespective of whether the Change Request was a "mistake," notice and comment rulemaking was required. Although an agency has an inherent power to correct errors in an adjudication, the D.C. Circuit has declined to extend such an inherent power to the rulemaking context. *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 752 (D.C. Cir. 2001).

The Secretary later initiated rulemaking in order to reverse her prior interpretation for the 2002 MDH base year that did not apply pre-base–year adjustments (an interpretation that was also in place at the time the SCH 2008 Change Request was issued). The same was required for her changed interpretation for the 2006 SCH base year.

## CONCLUSION

For the reasons set forth above, Appellants urge the Court to reverse the district court's judgment in favor or the Secretary, grant Appellants' summary judgment motion, and remand with instruction to enter judgment in favor of Appellants.

Dated:  September 2, 2014                    Respectfully submitted,


   /s/ Ankur J. Goel
Ankur J. Goel
Johnny H. Walker, III
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, N.W.
Washington, DC 20001
Telephone:  202.756.8000
Facsimile:    202.756.8087

Attorneys for Plaintiffs-Appellants

35

# ADDENDUM OF STATUTES

# CONTENTS

Excerpts from United States Code Title 42, Subsection 1395ww(b)(3) 2a

Excerpts from United States Code Title 42, Subsection 1395ww(d) ..................... 6a

Omnibus Budget Reconciliation Act of 1989 Pub L. 101-239, § 6003(f), 103 Stat. 2106, 2144–45 (1989) ........................................................................... 11a

Medicare Improvements for Patients and Providers Act of 2008 Pub. L. No. 110-275, § 122, 122 Stat. 2494 (2008) ....................................................... 13a

Medicare, Medicaid, and State Children's Health Insurance Program Balanced Budget Refinement Act of 1999, Pub. L. No. 106-113, § 405, 113 Stat. 1501, A-372 – A-373 (1999) ........................................................................ 14a

**Excerpts from United States Code Title 42, Subsection 1395ww(b)(3)**

**(b) computation of payment; definitions; exemptions; adjustments**

\* \* \*

**(3)**

\* \* \*

**(C)** In the case of a hospital that is a sole community hospital (as defined in subsection (d)(5)(D)(iii) of this section), subject to subparagraphs (I) and (L), the term ''target amount'' means—

(i) with respect to the first 12-month cost reporting period in which this subparagraph is applied to the hospital—

(I) the allowable operating costs of inpatient hospital services (as defined in subsection (a)(4) of this section) recognized under this subchapter for the hospital for the 12-month cost reporting period (in this subparagraph referred to as the ''base cost reporting period'') preceding the first cost reporting period for which this subsection was in effect with respect to such hospital, increased (in a compounded manner) by—

(II) the applicable percentage increases applied to such hospital under this paragraph for cost reporting periods after the base cost reporting period and up to and including such first 12-month cost reporting period,

(ii) with respect to a later cost reporting period beginning before fiscal year 1994, the target amount for the preceding 12-month cost reporting period, increased by the applicable percentage increase under subparagraph (B)(iv) for discharges occurring in the fiscal year in which that later cost reporting period begins,

(iii) with respect to discharges occurring in fiscal year 1994, the target amount for the cost reporting period beginning in fiscal year 1993 increased by the applicable percentage increase under subparagraph (B)(iv), or

(iv) with respect to discharges occurring in fiscal year 1995 and each subsequent fiscal year, the target amount for the preceding year increased by the applicable percentage increase under subparagraph (B)(iv).

There shall be substituted for the base cost reporting period described in clause (i) a hospital's cost reporting period (if any) beginning during fiscal year 1987 if such substitution results in an increase in the target amount for the hospital.

\* \* \*

**(D)** For cost reporting periods ending on or before September 30, 1994, and for discharges occurring on or after October 1, 1997, and before October 1, 2012, in

2a

the case of a hospital that is a medicare-dependent, small rural hospital (as defined in subsection (d)(5)(G) of this section), subject to subparagraph (K), the term ''target amount'' means—

 (i) with respect to the first 12-month cost reporting period in which this subparagraph is applied to the hospital—

  (I) the allowable operating costs of inpatient hospital services (as defined in subsection (a)(4) of this section) recognized under this subchapter for the hospital for the 12-month cost reporting period (in this subparagraph referred to as the ''base cost reporting period'') preceding the first cost reporting period for which this subsection was in effect with respect to such hospital, increased (in a compounded manner) by—

  (II) the applicable percentage increases applied to such hospital under this paragraph for cost reporting periods after the base cost reporting period and up to and including such first 12-month cost reporting period, or

 (ii) with respect to a later cost reporting period beginning before fiscal year 1994, the target amount for the preceding 12-month cost reporting period, increased by the applicable percentage increase under subparagraph (B)(iv) for discharges occurring in the fiscal year in which that later cost reporting period begins,

 (iii) with respect to discharges occurring in fiscal year 1994, the target amount for the cost reporting period beginning in fiscal year 1993 increased by the applicable percentage increase under subparagraph (B)(iv), and

 (iv) with respect to discharges occurring during fiscal year 1998 through fiscal year 2012, the target amount for the preceding year increased by the applicable percentage increase under subparagraph (B)(iv).

There shall be substituted for the base cost reporting period described in clause (i) a hospital's cost reporting period (if any) beginning during fiscal year 1987 if such substitution results in an increase in the target amount for the hospital.

    \* \* \*

**(I)** **(i)** Subject to subparagraph (L), for cost reporting periods beginning on or after October 1, 2000, in the case of a sole community hospital there shall be substituted for the amount otherwise determined under subsection (d)(5)(D)(i) of this section, if such substitution results in a greater amount of payment under this section for the hospital—

  (I) with respect to discharges occurring in fiscal year 2001, 75 percent of the amount otherwise applicable to the hospital under subsection (d)(5)(D)(i) of this section (referred to in this clause as the ''subsection

(d)(5)(D)(i) amount'') and 25 percent of the rebased target amount (as defined in clause (ii));

(II) with respect to discharges occurring in fiscal year 2002, 50 percent of the subsection (d)(5)(D)(i) amount and 50 percent of the rebased target amount;

(III) with respect to discharges occurring in fiscal year 2003, 25 percent of the subsection (d)(5)(D)(i) amount and 75 percent of the rebased target amount; and

(IV) with respect to discharges occurring after fiscal year 2003, 100 percent of the rebased target amount.

(ii) For purposes of this subparagraph, the ''rebased target amount'' has the meaning given the term ''target amount'' in subparagraph (C) except that—

(I) there shall be substituted for the base cost reporting period the 12-month cost reporting period beginning during fiscal year 1996;

(II) any reference in subparagraph (C)(i) to the ''first cost reporting period'' described in such subparagraph is deemed a reference to the first cost reporting period beginning on or after October 1, 2000; and

(III) applicable increase percentage shall only be applied under subparagraph (C)(iv) for discharges occurring in fiscal years beginning with fiscal year 2002.

(iii) In no case shall a hospital be denied treatment as a sole community hospital or payment (on the basis of a target rate as such as a hospital) because data are unavailable for any cost reporting period due to changes in ownership, changes in fiscal intermediaries, or other extraordinary circumstances, so long as data for at least one applicable base cost reporting period is available.]

\* \* \*

**(K)**    (i) With respect to discharges occurring on or after October 1, 2006, in the case of a medicare-dependent, small rural hospital, for purposes of applying subparagraph (D)—

(I) there shall be substituted for the base cost reporting period described in subparagraph (D)(i) the 12-month cost reporting period beginning during fiscal year 2002; and

(II) any reference in such subparagraph to the ''first cost reporting period'' described in such subparagraph is deemed a reference to the first cost reporting period beginning on or after October 1, 2006.

(ii) This subparagraph shall only apply to a hospital if the substitution described in clause (i)(I) results in an increase in the target amount under subparagraph (D) for the hospital.

**(L)**     (i) For cost reporting periods beginning on or after January 1, 2009, in the case of a sole community hospital there shall be substituted for the amount otherwise determined under subsection (d)(5)(D)(i) of this section, if such substitution results in a greater amount of payment under this section for the hospital, the subparagraph (L) rebased target amount.

(ii) For purposes of this subparagraph, the term ''subparagraph (L) rebased target amount'' has the meaning given the term ''target amount'' in subparagraph (C), except that—

(I) there shall be substituted for the base cost reporting period the 12-month cost reporting period beginning during fiscal year 2006;

(II) any reference in subparagraph (C)(i) to the ''first cost reporting period'' described in such subparagraph is deemed a reference to the first cost reporting period beginning on or after January 1, 2009; and

(III) the applicable percentage increase shall only be applied under subparagraph (C)(iv) for discharges occurring on or after January 1, 2009.

### Excerpts from United States Code Title 42, Subsection 1395ww(d)

**(d) Inpatient hospital service payments on basis of prospective rates; Medicare Geographical Classification Review Board**

\* \* \*

**(1)(A) (iii)** beginning on or after April 1, 1988, is equal to—

(I) the national adjusted DRG prospective payment rate determined under paragraph (3) for such discharges, or

\*\*\*

**(3)** The Secretary shall determine a national adjusted DRG prospective payment rate, for each inpatient hospital discharge in a fiscal year after fiscal year 1984 involving inpatient hospital services of a subsection (d) hospital in the United States, and shall determine, for fiscal years before fiscal year 1997, a regional adjusted DRG prospective payment rate for such discharges in each region for which payment may be made under part A of this subchapter. Each such rate shall be determined for hospitals located in large urban, other urban, or rural areas within the United States and within each such region, respectively, as follows:

**(A)** UPDATING PREVIOUS STANDARDIZED AMOUNTS.—(i) For discharges occurring in a fiscal year beginning before October 1, 1987, the Secretary shall compute an average standardized amount for hospitals located in an urban area and for hospitals located in a rural area within the United States and for hospitals located in an urban area and for hospitals located in a rural area within each region, equal to the respective average standardized amount computed for the previous fiscal year under paragraph (2)(D) or under this subparagraph, increased for the fiscal year involved by the applicable percentage increase under subsection (b)(3)(B) of this section. With respect to discharges occurring on or after October 1, 1987, the Secretary shall compute urban and rural averages on the basis of discharge weighting rather than hospital weighting, making appropriate adjustments to ensure that computation on such basis does not result in total payments under this section that are greater or less than the total payments that would have been made under this section but for this sentence, and making appropriate changes in the manner of determining the reductions under subparagraph (C)(ii).

6a

(ii) For discharges occurring in a fiscal year beginning on or after October 1, 1987, and ending on or before September 30, 1994, the Secretary shall compute an average standardized amount for hospitals located in a large urban area, for hospitals located in a rural area, and for hospitals located in other urban areas, within the United States and within each region, equal to the respective average standardized amount computed for the previous fiscal year under this subparagraph increased by the applicable percentage increase under subsection (b)(3)(B)(i) of this section with respect to hospitals located in the respective areas for the fiscal year involved.

(iii) For discharges occurring in the fiscal year beginning on October 1, 1994, the average standardized amount for hospitals located in a rural area shall be equal to the average standardized amount for hospitals located in an urban area. For discharges occurring on or after October 1, 1994, the Secretary shall adjust the ratio of the labor portion to non-labor portion of each average standardized amount to equal such ratio for the national average of all standardized amounts.

(iv)    (I) Subject to subclause (II), for discharges occurring in a fiscal year beginning on or after October 1, 1995, the Secretary shall compute an average standardized amount for hospitals located in a large urban area and for hospitals located in other areas within the United States and within each region equal to the respective average standardized amount computed for the previous fiscal year under this subparagraph increased by the applicable percentage increase under subsection (b)(3)(B)(i) of this section with respect to hospitals located in the respective areas for the fiscal year involved.

    (II) For discharges occurring in a fiscal year (beginning with fiscal year 2004), the Secretary shall compute a standardized amount for hospitals located in any area within the United States and within each region equal to the standardized amount computed for the previous fiscal year under this subparagraph for hospitals located in a large urban area (or, beginning with fiscal year 2005, for all hospitals in the previous fiscal year) increased by the applicable percentage increase under subsection (b)(3)(B)(i) of this section for the fiscal year involved.

(v) Average standardized amounts computed under this paragraph shall be adjusted to reflect the most recent case-mix data available.

(vi) Insofar as the Secretary determines that the adjustments under paragraph (4)(C)(i) for a previous fiscal year (or estimates that such adjustments for a future fiscal year) did (or are likely to) result in a change in aggregate payments under this subsection during the fiscal year that are a result of changes in the coding or

7a

classification of discharges that do not reflect real changes in case mix, the Secretary may adjust the average standardized amounts computed under this paragraph for subsequent fiscal years so as to eliminate the effect of such coding or classification changes.

\* \* \*

**(4)**

\* \* \*

**(C)**    **(i)** The Secretary shall adjust the classifications and weighting factors established under subparagraphs (A) and (B), for discharges in fiscal year 1988 and at least annually thereafter, to reflect changes in treatment patterns, technology (including a new medical service or technology under paragraph (5)(K)), and other factors which may change the relative use of hospital resources.

\* \* \*

**(iii)** Any such adjustment under clause (i) for discharges in a fiscal year (beginning with fiscal year 1991) shall be made in a manner that assures that the aggregate payments under this subsection for discharges in the fiscal year are not greater or less than those that would have been made for discharges in the year without such adjustment.

\* \* \*

**(5)**

\* \* \*

**(D)**    **(i)** For any cost reporting period beginning on or after April 1, 1990, with respect to a subsection (d) hospital which is a sole community hospital, payment under paragraph (1)(A) shall be—
         (I) an amount based on 100 percent of the hospital's target amount for the cost reporting period, as defined in subsection (b)(3)(C) of this section, or
         (II) the amount determined under paragraph (1)(A)(iii),
whichever results in greater payment to the hospital.

8a

**(ii)** In the case of a sole community hospital that experiences, in a cost reporting period compared to the previous cost reporting period, a decrease of more than 5 percent in its total number of inpatient cases due to circumstances beyond its control, the Secretary shall provide for such adjustment to the payment amounts under this subsection (other than under paragraph (9)) as may be necessary to fully compensate the hospital for the fixed costs it incurs in the period in providing inpatient hospital services, including the reasonable cost of maintaining necessary
core staff and services.

* * *

**(G)**     **(i)** For any cost reporting period beginning on or after April 1, 1990, and before October 1, 1994, or discharges occurring on or after October 1, 1997, and before October 1, 2013, in the case of a subsection (d) hospital which is a medicare-dependent, small rural hospital, payment under paragraph (1)(A) shall be equal to the sum of the amount determined under clause (ii) and the amount determined under paragraph (1)(A)(iii).

**(ii)** The amount determined under this clause is—
          (I) for discharges occurring during the 36-month period beginning with the first day of the cost reporting period that begins on or after April 1, 1990, the amount by which the hospital's target amount for the cost reporting period (as defined in subsection (b)(3)(D) of this section) exceeds the amount determined under paragraph (1)(A)(iii); and
          (II) for discharges occurring during any subsequent cost reporting period (or portion thereof) and before October 1, 1994, or discharges occurring on or after October 1, 1997, and before October 1, 2013, 50 percent (or 75 percent in the case of discharges occurring on or after October 1, 2006) of the amount by which the hospital's target amount for the cost reporting period or for discharges in the fiscal year (as defined in subsection (b)(3)(D) of this section) exceeds the amount determined under paragraph (1)(A)(iii).

**(iii)** In the case of a medicare dependent, small rural hospital that experiences, in a cost reporting period compared to the previous cost reporting period, a decrease of more than 5 percent in its total number of inpatient cases due to circumstances beyond its control, the Secretary shall provide for such

9a

adjustment to the payment amounts under this subsection (other than under paragraph (9)) as may be necessary to fully compensate the hospital for the fixed costs it incurs in the period in providing inpatient hospital services, including the reasonable cost of maintaining necessary core staff and services.

**Omnibus Budget Reconciliation Act of 1989 Pub L. 101-239, § 6003(f), 103 Stat. 2106, 2144–45 (1989)**

**6003 Prospective Payment Hospitals**

\* \* \*

**(f)** CRITERIA AND PAYMENT FOR MEDICARE–DEPENDENT, SMALL RURAL HOSPITALS.—

(1) CRITERIA.—Section 1886(d)(5) of the Social Security Act (42 U.S.C. 1395ww(d)(5)), as amended by subsection (e)(1)(A), is further amended by inserting after subparagraph (F) the following new subparagraph:

"(G)  (i) For any cost reporting period beginning on or after April 1, 1990, and ending on or before March 31, 1993, with respect to a subsection (d) hospital which is a medicare-dependent, small rural hospital, payment under paragraph (1)(A) shall be—

"(I) an amount based on 100 percent of the hospital's target amount for the cost reporting period, as defined in subsection (b)(3)(D), or

"(II) the amount determined under paragraph (1)(A)(iii), whichever results in the greater payment to the hospital.

"(ii) In the case of a medicare dependent, small rural hospital that experiences, in a cost reporting period compared to the previous cost reporting period, a decrease of more than 5 percent in its total number of inpatient cases due to circumstances beyond its control, the Secretary shall provide for such adjustment to the payment amounts under this subsection (other than under paragraph (9)) as may be necessary to fully compensate the hospital for the fixed costs it incurs in the period in providing inpatient hospital services, including the reasonable cost of maintaining necessary core staff and services.

"(iii) The term 'medicare-dependent, small rural hospital' means, with respect to any cost reporting period to which clause (i) applies, any hospital—

"(I) located in a rural area,

"(II) that has not more than 100 beds,

"(III) that is not classified as a sole community hospital under subparagraph (D), and

"(IV) for which not less than 60 percent of its inpatient days or discharges during the cost reporting period beginning in fiscal year 1987 were attributable to inpatients entitled to benefits under part A.".

11a

(2) PAYMENT.—Section 1886(b)(3) of such Act (42 U.S.C. 1395ww(b)(3)), as amended by subsection (e)(1)(B), is further amended—

(i) in subparagraph (A), by striking "subparagraph (C)" and inserting "subparagraphs (C) and (D)", and

(ii) by adding at the end the following new subparagraph:

"(D) For cost reporting periods ending on or before March 31, 1993, in the case of a hospital that is a medicare-dependent, small rural hospital (as defined in subsection (d)(5)(G)), the term 'target amount' means—

"(i) with respect to the first 12–month cost reporting period in which this subparagraph is applied to the hospital—

"(I) the allowable operating costs of inpatient hospital services (as defined in subsection (a)(4)) recognized under this title for the hospital for the 12–month cost reporting period (in this subparagraph referred to as the 'base cost reporting period') preceding the first cost reporting period for which this subsection was in effect with respect to such hospital, increased (in a compounded manner) by—

"(II) the applicable percentage increases applied to such hospital under this paragraph for cost reporting periods after the base cost reporting period and up to and including such first 12–month cost reporting period, or

"(ii) with respect to a later cost reporting period, the target amount for the preceding 12–month cost reporting period, increased by the applicable percentage increase under subparagraph (B)(i) for discharges occurring in the fiscal year in which that later cost reporting period begins.

There shall be substituted for the base cost reporting period described in clause (i) a hospital's cost reporting period (if any) beginning during fiscal year 1987 if such substitution results in an increase in the target amount for the hospital.".

**Medicare Improvements for Patients and Providers Act of 2008 Pub. L. No. 110-275, § 122, 122 Stat. 2494 (2008)**

**122 Rebasing for sole community hospitals.**

(a) REBASING PERMITTED.—Section 1886(b)(3) of the Social Security Act (42 U.S.C. 1395ww(b)(3)) is amended by adding at the end the following new subparagraph:

''(L)     (i) For cost reporting periods beginning on or after January 1, 2009, in the case of a sole community hospital there shall be substituted for the amount otherwise determined under subsection (d)(5)(D)(i) of this section, if such substitution results in a greater amount of payment under this section for the hospital, the subparagraph (L) rebased target amount.

''(ii) For purposes of this subparagraph, the term 'subparagraph (L) rebased target amount' has the meaning given the term 'target amount' in subparagraph (C), except that—

''(I) there shall be substituted for the base cost reporting period the 12-month cost reporting period beginning during fiscal year 2006;

''(II) any reference in subparagraph (C)(i) to the 'first cost reporting period' described in such subparagraph is deemed a reference to the first cost reporting period beginning on or after January 1, 2009; and

''(III) the applicable percentage increase shall only be applied under subparagraph (C)(iv) for discharges occurring on or after January 1, 2009.''.

(b) CONFORMING AMENDMENTS.—Section 1886(b)(3) of the Social Security Act (42 U.S.C. 1395ww(b)(3)) is amended—

(1) in subparagraph (C), in the matter preceding clause (i), by striking ''subparagraph (I)'' and inserting ''subparagraphs (I) and (L)''; and

(2) in subparagraph (I)(i), in the matter preceding subclause (I), by striking ''For'' and inserting ''Subject to subparagraph (L), for''.

**Medicare, Medicaid, and State Children's Health Insurance Program Balanced Budget Refinement Act of 1999, Pub. L. No. 106-113, § 405, 113 Stat. 1501, A-372 – A-373 (1999)**

**405  Rebasing for certain sole community hospitals.**

Section 1886(b)(3) (42 U.S.C. 1395ww(b)(3)) is amended—

    (1) in subparagraph (C), by inserting "subject to subparagraph (I)," before "the term "target amount" means"; and

    (2) by adding at the end the following new subparagraph:

    "(I)    (i) For cost reporting periods beginning on or after October 1, 2000, in the case of a sole community hospital that for its cost reporting period beginning during 1999 is paid on the basis of the target amount applicable to the hospital under subparagraph (C) and that elects (in a form and manner determined by the Secretary) this subparagraph to apply to the hospital, there shall be substituted for such target amount—

        "(I) with respect to discharges occurring in fiscal year 2001, 75 percent of the target amount otherwise applicable to the hospital under subparagraph (C) (referred to in this clause as the 'subparagraph (C) target amount') and 25 percent of the rebased target amount (as defined in clause (ii));

        "(II) with respect to discharges occurring in fiscal year 2002, 50 percent of the subparagraph (C) target amount and 50 percent of the rebased target amount;

        "(III) with respect to discharges occurring in fiscal year 2003, 25 percent of the subparagraph (C) target amount and 75 percent of the rebased target amount; and

        "(IV) with respect to discharges occurring after fiscal year 2003, 100 percent of the rebased target amount.

    "(ii) For purposes of this subparagraph, the 'rebased target amount' has the meaning given the term 'target amount' in subparagraph (C) except that—

        "(I) there shall be substituted for the base cost reporting period the 12–month cost reporting period beginning during fiscal year 1996;

        "(II) any reference in subparagraph (C)(i) to the "first cost reporting period" described in such subparagraph is deemed a reference to the first cost reporting period beginning on or after October 1, 2000; and

        "(III) applicable increase percentage shall only be applied under subparagraph (C)(iv) for discharges occurring in fiscal years beginning with fiscal year 2002."

14a

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7,602 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman, 14-point type.

Dated:  September 2, 2014                Respectfully submitted,


     /s/ Ankur J. Goel
Ankur J. Goel
Johnny H. Walker, III
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, N.W.
Washington, DC 20001
Telephone:  202.756.8000
Facsimile:   202.756.8087

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of September 2014, I caused the

foregoing Brief of Appellants to be electronically filed using the Court's CM/ECF

system. I certify that the participants in the case are registered CM/ECF users and

that service will be accomplished by the appellate CM/ECF system. Pursuant to

this Court's Rules, I will also file five paper copies of the foregoing document, by

UPS overnight delivery, with the clerk of this Court.

Dated:  September 2, 2014                    Respectfully submitted,


                                             ___/s/ Ankur J. Goel_____
                                             Ankur J. Goel
                                             Johnny H. Walker, III
                                             MCDERMOTT WILL & EMERY LLP
                                             500 North Capitol Street, N.W.
                                             Washington, DC 20001
                                             Telephone:  202.756.8000
                                             Facsimile:   202.756.8087

                                             *Attorneys for Plaintiffs-Appellants*

38